H. LOUIS SIRKIN (Ohio Bar No. 0024573)
Sirkin Pinales & Schwartz LLP
105 West Fourth Street, Suite 920
Cincinnati, Ohio 45202
(513) 721-4876
Attorney for Defendant Lauren Gazzola

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

-----------------------------------------------------------------X

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Honorable Mary L. Cooper |
| Plaintiff, | : | Criminal No. 04-373 (MLC) |
| v. | : | |
| STOP HUNTINGDON ANIMAL CRUELTY USA, INC.; KEVIN KJONAAS; LAUREN GAZZOLA; JACOB CONROY; JOSHUA HARPER; ANDREW STEPANIAN; DARIUS FULLMER; and JOHN McGEE, | : | |
| Defendants. | : | |

-----------------------------------------------------------------X

## NOTICE OF MOTION TO DISMISS
## SUPERSEDING INDICTMENT

To:    Clerk of the Court
       United States District Court for the
       District of New Jersey
       Clarkson S. Fisher Federal Building and
       U.S. Courthouse
       402 East State Street, Fifth Floor
       Trenton, New Jersey 08608

       Charles B. McKenna
       Ricardo Solano, Jr.
       Assistant United States Attorneys
       970 Broad Street, Suite 700
       Newark, New Jersey 07102

PLEASE TAKE NOTICE that the undersigned attorney for Defendant Lauren Gazzola shall move before the Honorable Mary L. Cooper, United States District Judge, at the United States Courthouse, 402 East State Street, Trenton, New Jersey, at a date and time to be set by the Court, for an order dismissing the superseding indictment in the above-captioned case on the grounds that it violates the First and Fourteenth Amendments to the United States Constitution.

In support of the motion, Defendant Gazzola will rely upon the memorandum of law and attached exhibits which are being submitted simultaneously with this notice and on the argument of counsel at the hearing on the motion.

Respectfully submitted,

    /s/ H. Louis Sirkin
H. LOUIS SIRKIN (Ohio Bar No. 0024573)
Sirkin Pinales & Schwartz LLP
105 West Fourth Street, Suite 920
Cincinnati, Ohio 45202
(513) 721-4876
Counsel for Defendant Lauren Gazzola

Dated: February 3, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

----------------------------------------------------------------X

UNITED STATES OF AMERICA,                    :           Honorable Mary L. Cooper

      Plaintiff,                           :           Criminal No. 04-373 (MLC)

      v.                                   :

STOP HUNTINGDON ANIMAL CRUELTY               :
USA, INC.; KEVIN KJONAAS; LAUREN
GAZZOLA; JACOB CONROY; JOSHUA                :
HARPER; ANDREW STEPANIAN; DARIUS
FULLMER; and JOHN McGEE,                     :

      Defendants.                          :

----------------------------------------------------------------X


**DEFENDANT LAUREN GAZZOLA'S**
**MEMORANDUM IN SUPPORT OF**
**MOTION TO DISMISS SUPERSEDING INDICTMENT**


H. LOUIS SIRKIN (Ohio Bar No. 0024573)
Sirkin Pinales & Schwartz LLP
105 West Fourth Street, Suite 920
Cincinnati, Ohio 45202
(513) 721-4876
Attorney for Defendant Lauren Gazzola


Dated: February 3, 2005

## TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

I.       Introduction and Statement of Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.      Count One of the Superseding Indictment Should Be Dismissed because the AEPA
         is Unconstitutional Both on its Face and As Applied. . . . . . . . . . . . . . . . . . . . . . . . . . 2

         A.       The AEPA is unconstitutionally overbroad on its face. . . . . . . . . . . . . . . . . . . . 3

         B.       The AEPA is unconstitutional as applied to Ms. Gazzola.  . . . . . . . . . . . . . . . . 7

III.     Counts Two through Five of the Superseding Indictment Should Be Dismissed
         because the Acts Alleged Constitute Protected Political Expression. . . . . . . . . . . . . . . 9

IV.      Count Six of the Superseding Indictment Should Be Dismissed because the
         Communications Act of 1934 is Unconstitutional Both on its Face and As Applied.
         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

         A.       The Communications Act of 1934 is unconstitutional on its face. . . . . . . . . . . 11

         B.       The Communications Act of 1934 is unconstitutional as applied to
                  Ms. Gazzola. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

V.       Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Appendix:

         18 U.S.C. § 43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

i

# TABLE OF AUTHORITIES

## Cases

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 9

*Broderick v. Oklahoma*, 413 U.S. 601 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Buckley v. American Constitutional Law Found.*, 525 U.S. 182 (1999) . . . . . . . . . . . . . . . . . . 11

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Citizens Against Rent Control Coalition for Fair Housing v. Berkeley*,
    454 U.S. 290 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Dombrowski v. Pfister*, 380 U.S. 479 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Hess v. Indiana*, 414 U.S. 105 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

*Miller v. California*, 413 U.S. 15 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) . . . . . . . . . . . . . . . . . . . . . . . . 3, 11

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) . . . . . . . . . . . . . . . . . . . . . . 4-6, 9-10

*National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994) . . . . . . . . . . . . . . . 5

*National Organization for Women, Inc. v. Scheidler*, 537 U.S. 393 (2003) . . . . . . . . . . . . . . . 5

*New York v. Ferber*, 458 U.S. 747 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*New York Times v. Sullivan*, 376 U.S. 254 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13

*Record Revolution #6, Inc. v. City of Parma*, 638 F.2d 916 (6th Cir. 1980) . . . . . . . . . . . . . . . 3

*State of Missouri v. National Org. for Women, Inc.*, 620 F.2d 1301 (8th Cir. 1980) . . . . . . . . . . 5

*Talley v. California*, 362 U.S. 60 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Texas v. Johnson*, 491 U.S. 397 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

*Thornhill v. Alabama*, 310 U.S. 88 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Time, Inc. v. Hill*, 385 U.S. 374 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966) . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. O'Brien*, 391 U.S. 367 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

*United States v. Popa*, 187 F.3d 672 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

*Watts v. United States*, 394 U.S. 705 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-10

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## **Statutes**

18 U.S.C. § 43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 6

18 U.S.C. § 223(a)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10-13

18 U.S.C. § 2261A(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## MEMORANDUM

### I.    Introduction and Statement of Facts

Defendant Lauren Gazzola is charged by way of superseding indictment with: 1) one count of conspiracy to violate the Animal Enterprise Protection Act ("AEPA"), 18 U.S.C. § 43(d)(1); 2) four counts of interstate stalking in violation of 18 U.S.C. § 2261A(2); and 3) one count of conspiracy to violate the Communications Act of 1934 in violation of 18 U.S.C. § 223(a)(1)(C).  Ms. Gazzola's co-defendants have moved to dismiss these charges based on various theories of criminal and constitutional law, and she fully adopts the arguments and reasoning set forth in their respective motions.  In addition, Ms. Gazzola separately moves the Court to dismiss the charges against her on the grounds that the statutes under which she is charged are unconstitutional as applied to her and, on some occasions, facially.

The charges against Ms. Gazzola stem from her alleged involvement with an animal rights organization known as Stop Huntingdon Animal Cruelty ("SHAC").  The indictment alleges that SHAC established and maintains a website that targets Huntingdon Life Sciences ("HLS") and its clients and affiliates as a result of HLS' use of animals in chemical and pharmaceutical research. The indictment further contends that Ms. Gazzola and other named and unnamed associates of SHAC engaged in a pattern of activity, including conducting protests at corporate officials' homes and sending faxes and other communications to corporate offices, designed to force HLS out of business.  Noticeably absent from the indictment is any allegation of unlawful behavior beyond that expressly protected by the First Amendment.  Rather, read collectively, the facts set forth in the superseding indictment lead to the unmistakable conclusion that, if true, Ms. Gazzola and her co-defendants were engaging in pure political speech for the lawful and legitimate aim of stopping

1

animal cruelty.  Because Ms. Gazzola's activities were constitutionally protected from the outset, they cannot be prosecuted here and the superseding indictment must be dismissed.

**II.    Count One of the Superseding Indictment Should Be Dismissed because the AEPA is Unconstitutional Both on its Face and As Applied.**

The AEPA, which is reprinted in its entirety at Appendix A to this motion, criminalizes interstate activities which are designed to disrupt an animal enterprise and which actually cause the loss of property, whether physical or monetary.  *See* 18 U.S.C. § 43(a)(1)-(2).  The degree of punishment required varies based upon the degree of economic harm caused to the enterprise.  *Id.* at § 43(b).  To be considered in assessing the overall economic damage of a particular disruptive activity are lost profits.  *Id.* at § 43(d)(3).  As such, an otherwise lawful political campaign against an animal enterprise which serves its desired effect -- to reduce the profits associated with perceived animal cruelty -- can be prosecuted as animal terrorism under the statute and then additionally punished based upon the success of the campaign.

This is exactly the action the United States has taken in this prosecution.  Here, the government alleges that Ms. Gazzola and her co-defendants violated the AEPA by establishing a website that provides information about HLS and affiliate companies and by disseminating anti-animal cruelty information and communications to those corporations and their officers.[1]  For the reasons that follow, such a prosecution is barred by the First Amendment, as Ms. Gazzola's alleged activities constitute pure political speech deserving of full constitutional protection.

---

[1]As emphasized by Defendant Kjonaas in his Motion to Dismiss, noticeably lacking from the superseding indictment is any allegation that HLS or its clients and affiliates actually suffered a loss of property as a result of Ms. Gazzola's alleged actions against them.

2

### A.    The AEPA is unconstitutionally overbroad on its face.

The Due Process Clause of the Fourteenth Amendment prohibits laws that are overbroad in scope by requiring that laws refrain from punishing unintended, innocent, or constitutionally protected conduct.  *See Broderick v. Oklahoma*, 413 U.S. 601, 613 (1973); *Coates v. City of Cincinnati*, 402 U.S. 611 (1971).  Pursuant to this protection, a law is facially void for overbreadth if it "does not aim specifically at evils within the allowable area of [government] control, but . . . sweeps within its ambit other activities that . . . constitute an exercise" of constitutionally protected expression.  *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).  The statutory language may be very clear, yet "sweep unnecessarily broadly to invade the areas of protected freedoms."  *Record Revolution #6, Inc. v. City of Parma*, 638 F.2d 916, 927 (6th Cir. 1980) (citing *Sawyer v. Sandstrom*, 615 F.2d 311 (5th Cir. 1980), *rev'd. on other grounds*, 451 U.S. 1013 (1981)).  In this manner, an overbroad statute enacts a chilling effect on constitutionally protected or otherwise lawful conduct. *Id.*  Laws which are overbroad and threaten the exercise of First Amendment rights are therefore unconstitutional.  *Broadrick*, 413 U.S. 601.

Among the rights protected by the First Amendment from overbroad governmental regulation is the right of association for the purpose of engaging in political protest activity.  *See, e.g., Citizens Against Rent Control Coalition for Fair Housing v. Berkeley*, 454 U.S. 290, 294 (1981) ("the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process").  Undergirding this right is the concept that collective action resonates more effectively than individual speech.  *Id*.  Indeed, "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association."  *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958).  In this regard, the

3

right of free expression and the right to free association are inextricably linked; the individual right to speak out on public and political topics is all the more strong when a group of individuals chooses to speak collectively for a common purpose.  *See, e.g., NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).[2]

When the speech itself is political in nature, these rights are intensified even further. Embedded in the First Amendment's guarantee of free expression is the notion that core political speech is deserving of the utmost protection, particularly when the content of the speech is controversial or unpopular.  *See, e.g., Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").  In fact, "a principal 'function of free speech under our system of government is to invite dispute.  It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.'" *Id.* at 408-409 (citing *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949)).  This core function of the First Amendment produces an ironic yet important result; it is the potentially offensive and unpopular expression that is most deserving of constitutional protection.[3]

---

[2]*Claiborne* is perhaps the most significant decision to the First Amendment issues raised by Ms. Gazzola and should control the Court's resolution of Ms. Gazzola's claims.  The background and holding of *Claiborne*, however, have been discussed at length in the memoranda filed by Defendants SHAC and Kjonaas.  For the sake of economy, Ms. Gazzola will not repeat that analysis here, but instead adopts the description of the case set forth by her co-defendants.

[3]Consistent with this principle, the United States Supreme Court has recognized only three limited categories of expressive material not deserving of First Amendment protection: 1) "fighting words," or words which are likely to provoke an immediate, violent response, *Brandenburg v. Ohio*, 395 U.S. 444 (1969); *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942); 2) child pornography, *New York v. Ferber*, 458 U.S. 747 (1982); and 3) obscenity, *Miller v. California*, 413 U.S. 15 (1973).

4

Where collective speech focuses on content protected by the First Amendment, the federal courts' protection of collective boycott activity from criminal prosecution and civil liability has been unwavering.  For example, in *Claiborne*, the Supreme Court acknowledged the First Amendment protection that adheres to forceful political action in support of a boycott: "[s]peech does not lose its protected character [] simply because it may embarrass others or coerce them into action." *Claiborne*, 458 U.S. at 910.  Similarly, in *State of Missouri v. National Org. for Women, Inc.*, 620 F.2d 1301 (8th Cir. 1980), the Eighth Circuit extended First Amendment protection to an organized state-wide boycott designed to pressure Missouri into ratifying the Equal Rights Amendment.  This protection equally applies when the purpose of an organized economic campaign is to bring about corporate, rather than governmental, change.  *See, e.g., United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966) (holding that secondary boycott activity by labor unions is shielded from civil liability).[4]

Application of these principles to the AEPA makes it clear that the statute is overbroad in violation of the First and Fourteenth Amendments because it criminalizes presumptively protected,

---

The Supreme Court has also extended only limited First Amendment protection to libel and slanderous statements that are false or were published with reckless disregard for their truth.  *See Hustler Magazine v. Falwell*, 485 U.S. 46 (1988); *Time, Inc. v. Hill*, 385 U.S. 374 (1967); *New York Times v. Sullivan*, 376 U.S. 254 (1964).  Absent the application of these exceptions, the First Amendment prohibits governments from enacting a prior restraint on the right to engage in protected expression and expressive conduct by criminally prosecuting individuals who choose to exercise that right.  *See Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965) ("The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure."); *see also Wisconsin v. Mitchell*, 508 U.S. 476 (1993) (recognizing that hate crime sentencing enhancement may enact a chilling effect on the expression of unpopular beliefs).

[4]While not decided on First Amendment grounds, the Supreme Court's decisions in *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994), and 537 U.S. 393 (2003), are indicative of the Court's intention to strictly interpret civil and criminal statutes when they are applied to political protest activities against private entities.

otherwise legal conduct.  More specifically, the statute can be read to punish interstate protest activities, such as a boycott, which are effective at stymying animal testing yet are wholly protected by the First Amendment.  The statute simply requires interstate action designed to disrupt an animal enterprise that results in the loss of property, including lost profits, on the part of the business.  Under its plain terms, then, the statute can apply to a whole host of lawful activities, including, for example, the anti-fur print ad campaign endorsed by numerous celebrities, if those activities have the corresponding effect of reducing profits generated by the commercial exploitation of animals.  In other words, the statute effectively criminalizes animal rights protests and other lawful activities designed to reduce the frequency of animal cruelly.

It is true that the statute affirmatively excludes from its purview "any lawful disruption that results from lawful public, governmental or animal enterprise employee reaction to the disclosure of information about an animal enterprise."  18 U.S.C. § 43(d)(2).  Yet it is hard to conceptualize what exactly the statute punishes if it does not punish boycotts and other organized political action.  Buttressing this conclusion is the fact that the exclusion provision is directly at odds with the definition of "economic damage" relevant to sentencing.  Because that definition permits lost profits to be considered in computing the loss of property suffered by an animal enterprise, the AEPA in effect authorizes prosecutions against individuals who speak out against companies which harm animals and who, as a result, reduce the profits generated from the companies' acts of animal cruelty. This violates the First Amendment under *Claiborne*, 458 U.S. 886, and its progeny.

Moreover, the exclusion provision only applies to corporate losses that result from the disclosure of information, not from the exercise of economic or political pressure placed on corporate employees, officers, and clients.  *See* 18 U.S.C. § 43(d)(2).  This violates the bedrock

principle that collective political ***action*** in the form of boycotts, demand letters, and lawful coercion, is as equally protected as collective political ***speech***.  Indeed, it was the economic boycott in *Claiborne* and *State of Missouri v. NOW* and the union activity in *United Mine Workers* that triggered the First Amendment, and not necessarily any actual print or verbal speech by the organizations involved.  By failing to exclude these collective actions, the AEPA in effect criminalizes organized political campaigns that include elements of expressive conduct as well as pure speech.  The First Amendment guarantees of free expression and free association do not permit such a result.  As a result, the AEPA is unconstitutionally overbroad and should be invalidated on its face.

**B.    The AEPA is unconstitutional as applied to Ms. Gazzola.**

The AEPA is equally unconstitutional as it is being applied in this case.  The sum of the allegations against Ms. Gazzola in support of the conspiracy are that she participated in the SHAC website, engaged in protest activities outside corporate officers' homes, and contacted a corporation doing business with HLS regarding a "black fax" campaign.  Even if true, these activities are fully protected by the First Amendment.  To the extent Count One relies upon the SHAC website and the demand letter, these communications are pure political speech deserving of the utmost constitutional protection.  *See, e.g., Johnson*, 491 U.S. at 414.  The Court must therefore apply strict scrutiny to the government's attempt to prosecute Ms. Gazzola for her alleged expression.  *See R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992).  The indictment fails to satisfy this rigid test because there exists no compelling governmental interest in suppressing open dialogue and debate about animal rights issues.

Ms. Gazzola's alleged protest activities outside corporate officers' homes are equally protected, although under a theory of intermediate review rather than strict scrutiny. Under *United States v. O'Brien*, 391 U.S. 367, 377 (1968), communicative conduct is immune from governmental regulation unless: 1) the regulation is within the constitutional powers of government; 2) it furthers a substantial governmental interest; 3) that interest is unrelated to the suppression of free expression; and 4) the incidental restriction on First Amendment freedoms is no greater than necessary to further the interest. As applied to Ms. Gazzola's conduct, which at most caused the resignation of a single employee and no other economic hardship to HLS and its clients, the AEPA cannot pass constitutional muster under *O'Brien*. First, it appears that the governmental interest underlying the AEPA in this instance is wholly related to the suppression of free expression. Rather than a legitimate attempt to punish the release of animals or the physical destruction of property, this prosecution is instead a direct attempt to silence SHAC and its members from expressing viewpoints that are critical of HLS and the corporate entities referenced in the indictment. Thus, as applied here, the AEPA fails the third prong of *O'Brien*.

Equally unsatisfied is the fourth prong. If the government's interest is truly to protect animal enterprises from the loss of property, the application of the AEPA to Ms. Gazzola and her co-defendants restricts a wide range of First Amendment activities, i.e., shouting at corporate officers, sending demand letters for change, and using bullhorns to denounce animal testing policies, that have nothing to do with the protection of animal enterprise property. Put another way, the government could more effectively achieve its goal of protecting those companies that use animals in their business ventures by criminalizing only those activities which harm or destroy corporate records and property rather than prosecuting animal rights activists who speak out against animal testing policies.

8

The fact that this prosecution impinges upon more speech than is necessary proves fatal to the AEPA's application in this case. The law is being unconstitutionally applied here and Count One of the superseding indictment should be dismissed on this basis.

### III.    Counts Two through Five of the Superseding Indictment Should Be Dismissed because the Acts Alleged Constitute Protected Political Expression.

As discussed above, the First Amendment generally protects communal activities designed to make a political point or achieve a political goal. *See, e.g., Claiborne*, 458 U.S. 886. This protection extends to generalized threats uttered under circumstances not likely to cause immediate breaches of the peace or imminent lawless action. *Brandenburg*, 395 U.S. at 447 (discussing the doctrine of "fighting words"). Instructive on the issue of whether a particular communication constitutes fighting words under this test are *Hess v. Indiana*, 414 U.S. 105 (1973), and *Watts v. United States*, 394 U.S. 705 (1969). At issue in *Hess* was whether the defendant's remark that "we'll take the f***ing street later" while a political demonstration was being cleared by police constituted fighting words. *Hess*, 414 U.S. at 106-107. Answering that question in the negative, the Court emphasized the fact that Hess was speaking generally and not to any specific person or group. *Id.* at 107-108. Because he did not appear to be advocating any immediate response, but was instead referring to possible future action, Hess' speech was immune from prosecution. *Id.* at 108. Similarly in *Watts*, the defendant's joking demeanor and attempt to make a political point when threatening to shoot President Johnson controlled the Court's characterization of his speech. *Watts*, 394 U.S. at 708. Recognizing that "debate on public issues should be uninhibited, robust, and wideopen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government

9

and public officials," the Court sided with Watts and agreed that his speech was constitutionally protected. *Id.* (internal citations omitted).

Much like the words uttered by Hess and Watts, Ms. Gazzola's alleged comments to corporate officials are protected free speech as opposed to fighting words. Given the context in which they occurred, these comments are more akin to political commentary on a socially significant issue and less akin to fighting words likely to inspire immediate lawlessness. It is clear from the superseding indictment that, if anything, Ms. Gazzola's activities are part and parcel with a legitimate, ongoing, constitutionally protected campaign to stop animal cruelty at HLS. The fact that she allegedly communicated with corporate officers at HLS and its affiliates does not divest the speech of its constitutional character. In fact, that fact actually enhances the protection afforded her speech because it was communicated to the audience most likely to bring about the social change she advocates. *See, e.g., Claiborne*, 458 U.S. at 928 (construing threat that boycott breakers would have their necks broken as protected speech rather than fighting words). Moreover, no immediate lawless action occurred as a result of her comments. As the Supreme Court has made clear on numerous occasions, "the mere *advocacy* of the use of force or violence does not remove speech from the protection of the First Amendment" absent an immediate lawless response to the suggestion. *Id.* (emphasis in original). Because no such response occurred here, Ms. Gazzola's activities are protected by the First Amendment and cannot be subject to criminal prosecution.

**IV.    Count Six of the Superseding Indictment Should Be Dismissed because the Communications Act of 1934 is Unconstitutional Both on its Face and As Applied.**

Defendant Gazzola is charged in Count Six with conspiring to provide annoying and harassing communications to various corporations without disclosing her identity in violation of 18

10

U.S.C. § 223(a)(1)(C). Because the statute defines criminal activity based upon the content -- or lack thereof -- of a particular communication, it is facially unconstitutional. In addition, the statute is being unconstitutionally applied here to target what are essentially political communications to a private entity fully protected by the First Amendment.

### A.    The Communications Act of 1934 is unconstitutional on its face.

The right to communicate anonymously is fully protected by the First Amendment. *See, e.g., McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958). To be sure, "[a]nonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind." *Talley v. California*, 362 U.S. 60, 64 (1960). This principle applies with equal force to group associations. *See Patterson*, 357 U.S. at 462. "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Id.*; *see also Buckley v. American Constitutional Law Found.*, 525 U.S. 182, 200 (1999) (invalidating on First Amendment grounds a Colorado statute that required initiative petition circulators to wear identification badges).

The District of Columbia Circuit considered these principles in the context of the Communications Act of 1934 in *United States v. Popa*, 187 F.3d 672 (D.C. Cir. 1999). At issue in *Popa* was whether the defendant, who had made seven anonymous phone calls to the United States Attorney without identifying himself, could be convicted for his speech. Ruling that he could not, the court emphasized the First Amendment protection that adheres to public and political commentary without regard to whether the speech itself is made anonymously. *Id.* at 676-77. Key to the decision was the fact that the speech itself was political in nature. *Id.* Applying intermediate

scrutiny, the court concluded under *O'Brien* that the government's interest in preventing unwanted telecommunications could be more narrowly achieved by a proscription that targeted contact between private citizens but excluded individuals intending to engage in public or political discourse. *Id*. at 677. In so doing, the court expressly recognized that attempts to "annoy, abuse, threaten or harass" for political purposes are constitutionally protected. *Id*. at 678 (finding fault with the statute because "no protection whatsoever is given to the political speech of one who intends both to communicate his political message and to annoy his auditor").

The rationale adopted in *Popa* applies with equal force here. By sweeping within its coverage those anonymous communications that are made for political reasons, 18 U.S.C. § 223(a)(1)(C) facially implicates the First Amendment. Under *O'Brien*, the government's interest in stemming unwanted and annoying communications could be more narrowly furthered by a regulation that excluded protected political speech, such as Popa's and Gazzola's. As such, the statute fails intermediate scrutiny, is unconstitutional, and cannot form the basis of a valid prosecution here.

Moreover, although not addressed by the *Popa* court, 18 U.S.C. § 223(a)(1)(C) is also unconstitutional because it is content-based. It is well-settled that anonymous communications are afforded constitutional protection. *See McIntyre*, 514 U.S. at 357 ("[a]nonymity is a shield from the tyranny of the majority."). Yet this is exactly the type of communication that the statute prohibits; but for the described communications occurring anonymously, they would be otherwise lawful and excluded from criminal prosecution. *See Popa*, 187 F.3d at 675 (noting that the statute's inclusion of anonymous calls "at least appears to make the prohibition depend upon the content of the call").

12

Under strict scrutiny, such a targeted regulation of speech cannot stand.  *See, e.g., R.A.V.*, 505 U.S. 377.

**B.    The Communications Act of 1934 is unconstitutional as applied to Ms. Gazzola.**

Much like Popa's telephone calls to the U.S. Attorney, Ms. Gazzola's alleged fax communications to the named corporations constitute protected political speech immune from prosecution.  As her alleged demand letter to W. Corp. indicates, these communications were designed to bring about change in corporate policies related to animal testing and experimentation. *See* Superseding Indictment, p. 19 ¶ 59.  To prosecute Ms. Gazzola in this instance would be to violate her free speech and association rights guaranteed by the First Amendment.  Under *Popa*, Count Six of the superseding indictment must be dismissed on the grounds that 18 U.S.C. § 223(a)(1)(C) is being unconstitutionally applied in this case.

**V.    Conclusion**

For the foregoing reasons, in addition to the reasons set forth in the Motions to Dismiss filed by Defendants SHAC and Kjonaas, Counts One through Six of the superseding indictment against Defendant Lauren Gazzola should be dismissed.

Respectfully submitted,

  /s/ H. Louis Sirkin
H. LOUIS SIRKIN (Ohio Bar No. 0024573)
Sirkin Pinales & Schwartz LLP
105 West Fourth Street, Suite 920
Cincinnati, Ohio 45202
(513) 721-4876
Counsel for Defendant Lauren Gazzola

Dated: February 3, 2005

13

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of February, 2005, the foregoing Notice of Motion and

Memorandum in Support were electronically filed with the Clerk of the United States District Court

for the District of New Jersey and that exact copies were provided via regular U.S. mail, postage

prepaid, to Charles McKenna and Ricardo Solano, Assistant United States Attorneys, 970 Broad

Street, Suite 700, Newark, New Jersey 07102, and to the Honorable Mary L. Cooper, United States

District Judge, 402 East State Street, Fifth Floor, Trenton, New Jersey 08608.


/s/ H. Louis Sirkin
_____
H. LOUIS SIRKIN (Ohio Bar No. 0024573)
Sirkin Pinales & Schwartz LLP
105 West Fourth Street, Suite 920
Cincinnati, Ohio 45202
(513) 721-4876
Counsel for Defendant Lauren Gazzola

Dated: February 3, 2005

G:\HLS\GAZZOLA\DISMISS.MOT

14